AFT MICHIGAN v MICHIGAN

Docket Nos. 313960 and 314065. Submitted August 6, 2013, at Lansing. Decided January 14, 2014, at 9:05 a.m. Leave to appeal sought.

AFT Michigan and other labor organizations brought an action in the Court of Claims against the state of Michigan and others, challenging the constitutionality of certain provisions of 2012 PA 300, which require members of the Michigan Public School Employees' Retirement System (MPSERS) to increase their payroll deductions in order to maintain the 1.5% pension factor that formerly applied to public school employee pensions and to contribute 3% of their compensation in order receive retiree healthcare benefits. The Michigan Education Association and other labor organizations filed a similar action in the Court of Claims against the state of Michigan and others. The Court of Claims consolidated the actions. The court, Rosemarie E. Aquilina, J., granted summary disposition in favor of defendants with regard to the constitutionality of the challenged pension and healthcare provisions in 2012 PA 300. Plaintiffs appealed. The Court of Appeals consolidated the appeals.

The Court of Appeals *held*:

1. The federal and state Constitutions prohibit the impairment of contracts. There is a three-step inquiry to determine if a state statute violates those prohibitions. First, the court must determine whether the state law has operated as a substantial impairment of a contractual relationship. Second, if there is a substantial impairment, the court must determine whether the state law serves a significant and legitimate public purpose. And third, if there is a legitimate public purpose, the court must examine whether the adjustment of rights and responsibilities of the contracting parties is based on reasonable conditions and is of a character appropriate to the public purpose justifying the adoption of the legislation. In this case, there was no impairment of a contractual relationship. The booklets prepared by the state that described the pension benefits to which members of MPSERS were formerly entitled did not create an enforceable contract, but rather were simply informational brochures concerning the then existing pension formula. Nor did the enactment of 1980 PA 300 create an

enforceable contract that the multiplier used to calculate pension benefits would remain 1.5%. There is a strong presumption that statutes do not create contractual rights, and there was no language in 1980 PA 300 indicating that the Legislature intended to surrender its legislative powers through the creation of contractual rights. Finally, Const 1963, art 9, § 24, states that the accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof. Section 24, however, only protects accrued benefits. 2012 PA 300 does not impair accrued benefits. Members of MPSERS will still have the 1.5% multiplier applied to services rendered before December 2012. It is only future services that are subject to a reduced multiplier should a member elect not to contribute 4% to his or her pension fund. Therefore, there was no impairment of a contract in violation of either the state or federal Constitutions.

2. Article 9, § 24 of Michigan's Constitution provides that the accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof, and that financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities. 2012 PA 300 does not violate the first clause of Const 1963, art 9, § 24 because the constitutional provision only protects accrued benefits, and the act does not diminish accrued benefits—only future benefits are implicated. Nor does 2012 PA 300 violate the second clause of Const 1963, art 9, § 24 by using current contributions to finance unfunded accrued liabilities. Const 1963, art 9, § 24 mandates that public employee pension systems be funded to a level that includes unfunded accrued liabilities, which are the estimated amounts that will be needed according to actuarial projections to fulfill presently existing pension obligations. A distinction must be drawn between the right to receive pension benefits and the funding method adopted by the Legislature to assure that monies are available for the payment of those benefits.

3. With regard to retiree healthcare benefits, those benefits are not accrued financial benefits protected by Const 1963, art 9, § 24. Further, employee contributions under 2012 PA 300 are voluntary. A member may choose to continue to participate in the retiree healthcare program and contribute 3% of his or her salary in order to do so, or the member may opt out of the program. Members who opt in but fail to qualify for retiree healthcare benefits will be refunded their contributions after they turn 60. Accordingly, 2012

PA 300 does not suffer from the same constitutional deficiencies identified in *AFT Mich v Michigan*, 297 Mich App 597 (2012), with regard to former MCL 38.1343e, as enacted by 2010 PA 75. By seeking voluntary participation from members, 2012 PA 300 rationally relates to the legitimate governmental purpose of maintaining healthcare benefits for retirees while easing financial pressure on public schools; therefore, it does not violate members' substantive due process rights. Similarly, because participation in the retiree healthcare system is now voluntary, there is no taking in violation of the state or federal Constitutions.

Affirmed.

GLEICHER, J., concurred in the result. With regard to retiree healthcare benefits, the majority reasons that the voluntary nature of 2012 PA 300 cured the constitutional infirmities identified in *AFT*, and plaintiffs fail to persuasively counter that conclusion. Plaintiffs' pension benefits are clothed with constitutional protection from impairment or diminishment under Const 1963, art 9, § 24, but 2012 PA 300 does not impair or reduce benefits earned pursuant to the 1.5% multiplier before 2012 PA 300 took effect, and the Legislature may properly attach new conditions for earning financial benefits that have not yet accrued. Further, with regard to the second clause of Const 1963, art 9, § 24, if 2012 PA 300 resulted in the collection of money used to meet pre-2012 unfunded liabilities through an improper borrowing scheme, as applied the act would raise constitutional concerns. However, the evidence necessary to evaluate that issue was not before the Court, and 2012 PA 300 passed constitutional muster with regard to the issues raised and presented.

1. CONSTITUTIONAL LAW — IMPAIRMENT OF CONTRACTS BY GOVERNMENT — INFORMATIONAL BROCHURES — PUBLIC SCHOOL EMPLOYEES — PENSION BENEFITS.

The booklets prepared by the state that described the pension benefits to which members of the Michigan Public School Employees' Retirement System were formerly entitled did not create an enforceable contract, but were simply informational brochures concerning the then existing pension formula.

2. CONSTITUTIONAL LAW — IMPAIRMENT OF CONTRACTS BY GOVERNMENT — STATUTES — PUBLIC SCHOOL EMPLOYEES — PENSION BENEFITS.

There is a strong presumption that statutes do not create contractual rights; 1980 PA 300 did not create an enforceable contract that the multiplier used to calculate pension benefits would remain 1.5% for members of the Michigan Public School Employees' Retirement System.

3. CONSTITUTIONAL LAW — PUBLIC SCHOOL EMPLOYEES — PENSION BENEFITS.

Under Const 1963, art 9, § 24, the accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof, and financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities; 2012 PA 300, which requires members of the Michigan Public School Employees' Retirement System to increase their payroll deductions in order to maintain the 1.5% pension factor that formerly applied to public school employee pensions does not violate Const 1963, art 9, § 24.

4. CONSTITUTIONAL LAW — PUBLIC SCHOOL EMPLOYEES — RETIREE HEALTHCARE BENEFITS.

Under Const 1963, art 9, § 24, the accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof; retiree healthcare benefits are not accrued financial benefits implicated by Const 1963, art 9, § 24.

5. CONSTITUTIONAL LAW — PUBLIC SCHOOL EMPLOYEES — RETIREE HEALTHCARE BENEFITS — VOLUNTARY CONTRIBUTIONS — SUBSTANTIVE DUE PROCESS — TAKINGS CLAUSE.

Under 2012 PA 300, members of the Michigan Public School Employees' Retirement System must contribute 3% of their compensation in order receive retiree healthcare benefits; members who opt in but fail to qualify for retiree healthcare benefits will be refunded their contributions after they turn 60; 2012 PA 300 rationally relates to the legitimate governmental purpose of maintaining healthcare benefits for retirees while easing financial pressure on public schools and does not violate members' substantive due process rights; because participation in the retiree healthcare system is voluntary, there is also no taking in violation of the state or federal Constitutions.

*Mark Cousens* for AFT Michigan and others.

*White, Schneider, Young & Chiodni, PC* (by *James A. White, Kathleen Corkin Boyle*, and *Timothy J. Dlugos*), and *Arthur R. Przybylowicz* for the Michigan Education Association.

*Bill Schuette*, Attorney General, *Aaron D. Lindstrom*, Solicitor General, *Matthew Schneider*, Chief Legal Counsel, and *Frank J. Monticello, Joshua O. Booth*, and *Patrick M. Fitzgerald*, Assistant Attorneys General, for the state of Michigan and others.

Before: SAAD, P.J., and K. F. KELLY and GLEICHER, JJ.

K. F. KELLY, J. Plaintiffs in these consolidated appeals, AFT Michigan et al. and the Michigan Education Association (the MEA) et al.,[1] labor organizations representing public school employees, appeal of right the Court of Claims' orders dismissing their challenges to provisions of 2012 PA 300. 2012 PA 300, effective September 4, 2012, amended the Public School Employees Retirement Act (PSERA), MCL 38.1301 *et seq.*, and altered future healthcare and retirement benefit plans available to public school employees for services performed after December 1, 2012. Finding no error warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Pursuant to MCL 38.1359, MCL 38.1343g, and MCL 38.1384b, members of the Michigan Public School Employees' Retirement System (MPSERS) created under the PSERA were asked to make a choice in terms of their future pension benefits:

(1) Members of the "Basic Plan," who historically contributed nothing to their pensions, would now be expected to contribute 4% of their compensation to their pensions. Those individuals hired between January 1990 and July 2010 and those former Basic Plan members who transferred into the Member Investment

---

[1] Referred to collectively as "plaintiffs."

Plan (MIP) would increase their contribution to 7%. Members who opted into the Basic Plan and MIP Plan would maintain the current 1.5% pension multiplier.

(2) Members could maintain current contribution rates, freeze existing benefits at the 1.5% multiplier, and receive a 1.25% pension multiplier for future years of service.

(3) Members could freeze existing pension benefits and move into a defined contribution, 401(k)-style, plan with a flat 4% employer contribution for future service.

Additionally, under MCL 38.1343e and MCL 38.1391a members were asked to opt in or out of retiree healthcare benefits; members could either contribute 3% of their compensation to receive the future benefit, or they could choose to receive no retiree healthcare benefits at retirement. MCL 38.1391a(8) further provided that a member who opted into the retiree healthcare program, but ultimately did not meet the eligibility requirements (e.g., because of a failure to work the requisite number of years) would be refunded his or her contribution starting at age 60 over a period of 60 months.

In two separate actions, plaintiffs filed complaints alleging: breach of contract and diminishment of contract, unconstitutional diminishment of members' accrued financial benefits, denial of substantive due process, and unjust enrichment to the state. The Court of Claims consolidated the two cases and considered the parties' competing motions for summary disposition. The Court of Claims concluded:

> As much as I would like to strike the section that deals with the state keeping the money on the health care and find that it's an unjust enrichment or a taking, . . . [m]y problem is this, if it were the only choice I would strike it down. The problem is we have informed consent and there are a number of choices, so the legislature in putting together this law

thought about that. It's very clear to me. They are giving choices and they are saying be careful, because if you leave early, for whatever reason, we're going to hang on to your money and you'll get it at the age of 60 as you retire and you'll get some money back on top of it but it's probably not going to be a lot of money because we're going to use it in the meantime. Now, I'm not happy about that and it's probably usury, but it's with that party's consent because they certainly have enough time, especially with the striking of the 52 days, to do the research, to do the math, to consult with an accountant, a financial planner, an advisor, and maybe not make that choice so the state doesn't have their money. On the other hand, if they're not a person who can save money, maybe that is the best choice for them.

As to the rest of the sections, again, there is this delineation between vested and non-vested benefits. It does not appear to me that the legislature is touching anything that is vested.

And as to the brochures, here's the problem. I have made rulings against the state for exactly this. Treasury, for example, puts out these advisories about how our tax code is going to change and how people should pay taxes and they've come in here on cases saying that a business did not follow these advisory tax rules and they have charged people with additional taxes because they didn't follow this advisory rule. And I've said, well, this is only advisory, it's not in the tax code yet so, state, you can't have your way and the taxpayer wins. Because there's also disclaimers there.

And I find the same ruling here. There are pamphlets that the state puts out about here's how your pension is going to work and there's disclaimers on it. It's really only advisory in nature about how--here's how your retirement works. I don't believe that a pamphlet can be part of a contract. I think it's nice that it's out there. I think it helps, but unless it is attached to the contract, it's got everybody's signatures, and it's made part of the black and white contract, it's not part of the contract. So I am finding that as informative as those pamphlets are, they're not part of

the contract. It's consistent with other rulings that I've made that I have been upheld on.

And so I think what the state has done with Public Act 300 of 2012 is left intact the retirement system with what's been vested and they are making members make elections on unvested pieces. So with the exception of the 52 days, I'm leaving the rest intact.[2]

Plaintiffs now appeal as of right,[3] challenging four separate provisions of 2012 PA 300:

(1) MCL 38.1343e, which requires a 3% contribution toward retiree healthcare.

(2) MCL 38.1343g, which requires a 4% contribution to the pension plan for a member to remain in the Basic Plan.

(3) MCL 38.1384b, which reduces the multiplier used in calculating pension benefits for those individuals who opt out of making the contributions required under MCL 38.1343g.

(4) MCL 38.1391a(8), which provides the mechanism for refunding contributions to individuals who opt into the retiree healthcare plan but ultimately fail to qualify to receive those benefits.

## II. ANALYSIS

### A. STANDARDS OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition. *Maiden v Rozwood*, 461 Mich

---

[2] Although not an issue on appeal, the Court of Claims struck as unreasonable a 52-day election period provided under MCL 38.1359, finding that such a short time deprived members of the opportunity to make a reasonably informed decision.

[3] The appeals have been consolidated for appellate review. *AFT Mich v Michigan*, unpublished order of the Court of Appeals, entered January 9, 2013 (Docket Nos. 313960 and 314065).

109, 118; 597 NW2d 817 (1999). Whether a contract exists is a question of law that this Court reviews de novo. *Kloian v Domino's Pizza, LLC*, 273 Mich App 449, 452; 733 NW2d 766 (2006). Finally, the question whether 2012 PA 300 violates the Constitution is a question of law that is reviewed de novo. *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009).

### B. BREACH OF CONTRACT

Plaintiffs argue that 2012 PA 300 unconstitutionally impairs existing contractual obligations concerning pension and retiree healthcare benefits in violation of both the federal and state Constitutions. We disagree.

In relevant part, the United States Constitution provides, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." US Const, art I, § 10, cl 1. And Michigan's 1963 Constitution states, in relevant part that "[n]o bill of attainder, ex post facto law or law impairing the obligation of contract shall be enacted." Const 1963, art 1, § 10. We have recently set forth the process for determining whether a statute violates these constitutional clauses:

> Currently, whether a state statute violates the Contract Clause is determined by reference to a three-step inquiry . . . . First, courts must determine whether the state law has operated as a substantial impairment of a contractual relationship. If it constitutes a substantial impairment, the court must look at whether the justification for the state law is based on a significant and legitimate public purpose. If a legitimate public purpose can be identified, the court looks at whether the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption. With respect to this third inquiry, [as] is customary in reviewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness

of a particular measure unless the state is one of the contracting parties. [*Wells Fargo Bank, NA v Cherryland Mall Ltd Partnership*, 300 Mich App 361, 373-374; 835 NW2d 593 (2013) (citations and quotation marks omitted; alterations in original).]

### 1. MEMBER HANDBOOKS AND BROCHURES

The AFT and its affiliated labor organizations (AFT) argue that the various pamphlets, handbooks, and informative brochures published by the state evidence a contract between the state and the members of MPS-ERS, under which the state agreed that a 1.5% multiplier would be used to calculate pension benefits. Alternatively, AFT argues that there is an "implied in law" contract.

"A party claiming a breach of contract must establish by a preponderance of the evidence (1) that there was a contract, (2) that the other party breached the contract and, (3) that the party asserting breach of contract suffered damages as a result of the breach." *Miller-Davis Co v Ahrens Constr, Inc (On Remand)*, 296 Mich App 56, 71; 817 NW2d 609 (2012). A valid contract has five elements: "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Calhoun Co v Blue Cross Blue Shield of Mich*, 297 Mich App 1, 13; 824 NW2d 202 (2012) (citation and quotation marks omitted).

An implied-in-law contract is a legal fiction "to enable justice be accomplished" even if there was no meeting of the minds and no contract was intended. *Detroit v Highland Park*, 326 Mich 78, 100; 39 NW2d 325 (1949). A contract will be implied in law to prevent unjust enrichment. *Martin v East Lansing Sch Dist*, 193 Mich App 166, 177; 483 NW2d 656 (1992). To sustain an unjust enrich-

ment claim, a plaintiff must demonstrate (1) the defendant's receipt of a benefit from the plaintiff and (2) an inequity to plaintiff as a result. *Dumas v Auto Club Ins Ass'n*, 437 Mich 521, 546; 473 NW2d 652 (1991); *Karaus v Bank of New York Mellon*, 300 Mich App 9, 23; 831 NW2d 897 (2013). Stated differently, to prevent unjust enrichment, the law will imply a contract when the defendant has been inequitably enriched at the expense of the plaintiff. *Morris Pumps v Centerline Piping, Inc*, 273 Mich App 187, 195; 729 NW2d 898 (2006). Courts, however, may not imply a contract if the parties have an express contract covering the same subject matter. *Martin*, 193 Mich App at 177.

AFT argues that publications generated by MPSERS clearly set forth that a member's pension would be based on a 1.5% multiplier. By way of example, AFT points to a 1990 booklet titled, "An Introduction to Your Retirement Plan." Under the heading, "PENSION FORMULA," the document states, "Your Retirement Plan provides a benefit that is determined by a formula. The formula is your final average salary times 1.5% (.015) times your total years of service credit . . . ." However, this same document contains the following disclaimer:

> This booklet was written as an introduction to your retirement plan. You should find it very helpful in the early stages of your planning for retirement. It is designed to answer commonly asked questions in a simple and easy to understand style. However, information in this booklet is not a substitute for the law. If differences of interpretation occur, the law governs. *The law may change at any time altering information in this booklet.* [Emphasis added.]

AFT also points to a 1997 publication which provides:

Your pension is calculated according to the following formula:

$$\textit{Your final average compensation}$$
$$X$$
$$\textit{1.5\% (.015)}$$
$$X$$
$$\textit{Your years of service credit} =$$
$$\textit{Your annual pension}$$

Again, however, the same publication provides the following disclaimer:

Remember, this book is a summary of the main features of the plan and not a complete description. The operation of the plan is controlled by the Michigan Public School Employees Retirement Act (Public Act 300 of 1980, as amended). *If the provisions of the Act conflict with this summary, the Act controls.* [Emphasis added.]

The Court of Claims did not err by concluding that the documents did not form an enforceable contract. The pamphlets and brochures were simply an informational explanation of the then existing formula; the state was not bound, in perpetuity, by the contents of those publications. Importantly, the disclaimers contained within each of the documents plainly demonstrate that the retirement system manifested no intent to be contractually bound by the formula and clearly warned that pensions were a product of legislation, which was subject to change at any time. These same disclaimers also compel a finding that AFT's claim for breach of implied contract must fail.

### 2. 1980 PA 300

AFT argues that 1980 PA 300 created a contract between the state and public school employees; beginning in 1945 every public school employee was given a

clear promise that the retirement multiplier used to calculate pension benefits would be 1.5%. However, this notion was specifically rejected by our Supreme Court in *Studier v Michigan Pub Sch Employees' Retirement Bd*, 472 Mich 642; 698 NW2d 350 (2005).

At issue in *Studier* was whether 1980 PA 300 created a contract with public school retirees such that retiree healthcare benefits could not be changed without running afoul of the contract clauses of the federal and state Constitutions. *Id.* at 645. Amendments of the healthcare plan increased the amount of deductibles that retirees were required to pay and also increased the copays and out-of-pocket expenses that retirees paid for prescription drugs. *Id.* at 646. Several public school retirees brought suit, arguing, *inter alia*, that the copay and deductible increases impaired an existing contractual obligation. *Id.* at 647-648.

In rejecting the assertion that the statute created a contractual right to receive healthcare benefits, our Supreme Court noted that "a fundamental principle of the jurisprudence of both the United States and this state is that one legislature cannot bind the power of a successive legislature." *Id.* at 660. It further noted "the strong presumption that statutes do not create contractual rights." *Id.* at 661. This is in keeping with " 'the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state.' " *Id.* quoting *Nat'l R Passenger Corp v Atchison, Topeka & Santa Fe R Co*, 470 US 451, 465–466; 105 S Ct 1441; 84 L Ed 2d 432 (1985).

Thus, "[i]n order for a statute to form the basis of a contract, the statutory language must be plain and susceptible of no other reasonable construction than that the Legislature intended to be bound to a con-

tract," and "absent an adequate expression of an actual
intent of the State to bind itself, courts should not
construe laws declaring a scheme of public regulation as
also creating private contracts to which the state is a
party." *Studier*, 472 Mich at 662 (quotation marks and
citations omitted). A legislature may demonstrate its
intent to be contractually bound by using terms such as
"contract," "covenant" or "vested rights." *Id.* at 663-
664. Our Supreme Court noted that nothing in MCL
38.1391 (the statute establishing the healthcare ben-
efits) indicated the creation of contractual rights:

> Indeed, by its plain language, the statute merely shows
> a policy decision by the Legislature that the retirement
> system pay "the entire monthly premium or membership
> or subscription fee" for the listed health care benefits on
> behalf of a retired public school employee who chooses to
> participate in whatever plan the board and the Department
> of Management and Budget authorize. However, nowhere
> in the statute did the Legislature require the board and the
> department to authorize a particular plan containing a
> specific monthly premium, membership, or subscription
> fee or, alternatively, explicitly preclude the board and the
> department from amending whatever plan they authorize.
> Additionally, nowhere in the statute did the Legislature
> require the board and the department to authorize a plan
> containing specified deductibles and copays. In fact, no-
> where in the statute did the Legislature even mention
> deductibles and copays. Further, nowhere in the statute did
> the Legislature covenant that it would not amend the
> statute to remove or diminish the obligation of the MPS-
> ERS to pay the monthly premium, membership, or sub-
> scription fee; nor did it covenant that any changes to the
> plan by the board and the department, or amendments to
> the statute by the Legislature, would apply only to a
> specific class or group of public school retirees. Again, had
> the Legislature intended to surrender its power to make
> such changes, it would have done so explicitly. [*Id.* at
> 664-665 (citations omitted).]

The Supreme Court also noted that previous legislatures had exercised their powers to amend the statute throughout the years, which was further indication that no contractual rights were created. *Id.* at 665-666.

We conclude that *Studier* applies to plaintiffs' claims and that 1980 PA 300 did not create an enforceable contract. There is absolutely nothing in the statute that indicates the Legislature's intent to enter into a contract and bind future legislatures. Had the Legislature intended to surrender its legislative powers through the creation of contractual rights, it would have expressly done so by employing such terms as "contract," "covenant," or "vested rights." *Id.* at 663-664.

### 3. CONST 1963, ART 9, § 24

Finally, plaintiffs argue that pension benefits are contractual rights guaranteed by the state Constitution and that 2012 PA 300 unconstitutionally diminishes those benefits in violation of Const 1963, art 9, § 24. However, as will be discussed further, § 24 protects only those pension benefits that have already accrued, not future benefits.

Accordingly, because there was no breach of contract, it follows that there was no impairment of contract in violation of either the state or federal Constitutions.

### C. PENSION BENEFITS

Plaintiffs argue that 2012 PA 300 violates Const 1963, art 9, § 24, which provides:

> The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

> Financial benefits arising on account of service rendered
> in each fiscal year shall be funded during that year and
> such funding shall not be used for financing unfunded
> accrued liabilities.

Again, we hold that *Studier* is applicable here. At
issue in *Studier* was whether healthcare benefits paid to
public school retirees constituted "accrued financial
benefits" subject to protection from diminishment or
impairment under Const 1963, art 9, § 24. *Studier*, 472
Mich at 645.

Our Supreme Court concluded that "health care
benefits are not protected by Const 1963, art 9, § 24
because they neither qualify as 'accrued' benefits nor
'financial' benefits as those terms were commonly un-
derstood at the time of the Constitution's ratification
and, thus, are not 'accrued financial benefits.' " *Id.* at
658-659. First, as it related to the term "accrued," the
Court held that "the ratifiers of our Constitution would
have commonly understood 'accrued' benefits to be
benefits of the type that increase or grow over time—
*such as a pension payment or retirement allowance that
increases in amount along with the number of years of
service a public school employee has completed.*" *Id.* at
654 (emphasis added). Next, as it related to the term
"financial," the Court noted that healthcare benefits
did not qualify as financial benefits because "the ratifi-
ers of our Constitution would have commonly under-
stood 'financial' benefits to include only those benefits
that consist of monetary payments, and not benefits of
a nonmonetary nature such as health care benefits." *Id.*
at 655. "[T]he ratifiers would have commonly under-
stood the phrase 'accrued financial benefits' to be one of
limitation that would restrict the scope of protection
provided by art 9, § 24 to monetary payments for *past*
services." *Id.* at 657-658 (emphasis added).

Therefore, under *Studier*, pension benefits are the type that increase or grow over time commensurate with the number of years of service a public school employee has completed and such benefits are protected by Const 1963, art 9, § 24. However, pension benefits are protected by § 24 only to the extent that they are for *past* services. 2012 PA 300 does nothing to affect or impair members' vested pension benefits. Members will still have the 1.5% multiplier applied to services rendered before December 2012. It is only future service that becomes subject to a reduced 1.25% multiplier should a member elect not to contribute 4% to his or her pension fund.

We also find persuasive our Supreme Court's advisory opinion *Advisory Opinion re Constitutionality of 1972 PA 258*, 389 Mich 659; 209 NW2d 200 (1973), which addressed the constitutionality of a statute requiring members to pay an increased contribution to pensions with no corresponding increase in benefits.[4] The Court first noted that pensions were no longer considered a mere gratuity since the passage of Const 1963, art 9, § 24. *Id.* at 662-663. It further noted:

> Under this constitutional limitation the Legislature cannot diminish or impair accrued financial benefits, but we think it may properly attach new conditions for earning financial benefits which have not yet accrued. Even though compliance with the new conditions may be necessary in order to obtain the financial benefits which have accrued, we would not regard this as a diminishment or impairment of such accrued benefits unless the new conditions were unreasonable and hence subversive of the constitutional protection. [*Id.* at 663-664.]

---

[4] "It is important to emphasize the fact that an advisory opinion does not constitute a decision of the Court and is not precedentially binding in the same sense as a decision of the Court after a hearing on the merits." *Advisory Opinion re Constitutionality of 1972 PA 294*, 389 Mich 441, 460 n 1; 208 NW2d 469 (1973).

Although the advisory opinion may not be binding, its analysis is persuasive. 2012 PA 300 does nothing to diminish or impair a member's vested pension benefits; only future benefits are implicated. Accordingly, reading the advisory opinion in conjunction with *Studier*, we conclude that 2012 PA 300 does not run afoul of Const 1963, art 9, § 24, and plaintiffs' claims are without merit.

The MEA's argument that 2012 PA 300 violates the second clause of § 24 must also fail. The *Studier* Court explained:

> That art 9, § 24 only protects those financial benefits that increase or grow over time is not only supported but, indeed, confirmed by the interaction between the first and second clauses of that provision. Specifically, the first clause contractually binds the state and its political subdivisions to pay for retired public employees' "accrued financial benefits . . . ." Thereafter, the second clause seeks to ensure that the state and its political subdivisions will be able to fulfill this contractual obligation by requiring them to set aside funding each year for those "[f]inancial benefits arising on account of service rendered in each fiscal year . . . ." Thus, because the second clause only requires the state and its political subdivision to set aside funding for "[f]inancial benefits arising on account of service rendered in each fiscal year" to fulfill their contractual obligation of paying for "accrued financial benefits," it reasonably follows that "accrued" financial benefits consist only of those "[f]inancial benefits arising on account of service rendered in each fiscal year . . . ." [*Studier*, 472 Mich at 654-655 (alterations in original).]

"In years prior to the Constitution of 1963, the Legislature did not always make adequate appropriations to maintain the MPSERS on an actuarially sound basis. . . . The practical effect of this underfunding was that many pensioners had accumulated years of service

for which insufficient money had been set aside in the pension reserve funds to pay the benefits to which their years of service entitled them." *Kosa v State Treasurer*, 408 Mich 356, 365; 292 NW2d 452 (1980). MPSERS used current members' contributions to pay for unfunded accrued liabilities of retirees' pensions that had accrued before the passage of the 1963 Constitution. The Supreme Court held that "borrowing" from post-1963 Constitution reserves to pay pre-1963 Constitution benefits violated Const 1963, art 9, § 24 by using current service funds to finance unfunded accrued liabilities. *Id.* at 367-368.

The *Kosa* Court analyzed the history of the legislation by looking to the constitutional debates. It noted that "[a] clear distinction must be drawn between the right to receive pension benefits and the funding method adopted by the Legislature to assure that monies are available for the payment of such benefits." *Id.* at 371. As one Constitutional Convention delegate noted, " 'It is not intended that an individual employee should . . . be given the right to sue the employing unit to require the actuarial funding of past service benefits . . . . What it is designed to do is to say that when his benefits come due, he's got a contractual right to receive them.' " *Id.* at 370 n 21, quoting 1 Official Record, Constitutional Convention 1961, pp 773-774.

In fact, contrary to plaintiffs' argument, "the second paragraph of art 9, § 24 expressly mandates townships and municipalities to fund all public employee pension systems to a level *which includes unfunded accrued liabilities*," *Shelby Twp Police & Fire Retirement Bd v Shelby Twp*, 438 Mich 247, 255-256; 475 NW2d 249 (1991) (emphasis added), which " 'are the estimated amounts which will be needed according to actuarial

projections to fulfill presently existing pension obligations . . . ,' " *id.* at 256 n 4, quoting *Kosa*, 408 Mich at 364 n 11.

Accordingly, 2012 PA 300 does not violate Const 1963, art 9, § 24 as it relates to members' pensions.

### D. HEALTHCARE BENEFITS

Plaintiffs contend that 2012 PA 300 does not cure the constitutional deficiencies identified in *AFT Mich v Michigan*, 297 Mich App 597; 825 NW2d 595 (2012). We disagree.

In *AFT*, several public school employees and their representative organizations brought a challenge to the former version of MCL 38.1343e, as enacted by 2010 PA 75, which required public school districts and reporting units to withhold 3% of public school employees' wages and remit the amount to MPSERS as "employer contributions" to the trust that funded retiree healthcare benefits. *AFT*, 297 Mich App at 603-604. The plaintiffs argued that the statute resulted in the impairment of contracts and violated their rights under both the Takings and Due Process Clauses of the federal and state Constitutions. The trial court held that the statute did not violate the Contract Clauses, but that it did violate the plaintiffs' rights under both the Takings and Due Process Clauses of the federal and state Constitutions. *Id.* at 606-607.

This Court disagreed with the trial court's conclusion that there was no violation of the Contract Clauses. We held that former MCL 38.1343e operated "as a substantial impairment of the employment contracts between plaintiffs and the employing educational entities. The contracts provide for a particular amount of wages and the statute requires that the employers not pay the contracted-for wages, but instead pay three percent less

than the contracts provide." *Id.* at 610. The Court noted, however, that while there was clearly substantial impairment of the employees' contract, the inquiry into whether there had been a violation of the Contract Clauses necessarily involved an examination as to "whether the particular impairment is necessary to the public good . . . ." *Id.* at 612 (citation and quotation marks omitted; emphasis omitted). And "[b]ecause governmental entities are parties to the contracts and benefit from the impairment, we are to employ heightened scrutiny in our review of the statute." *Id.* The Court examined cases from other jurisdictions wherein governments implemented temporary actions to deal with budget shortfalls, such as implementing mandatory furlough days. These jurisdictions held that such actions were tolerable because, although clearly an impairment of contract, the actions were implemented after other attempts to reduce budgetary shortfalls, including layoffs and reductions in services. Additionally, the employees' work hours were reduced to correspond with the reduction in wages. *Id.* at 613-614. In contrast, former MCL 38.1343e was not temporary; rather, it was a permanent reduction in salary meant as a long-term mechanism to restructure benefits. *Id.* at 614. "The state has not shown that it first undertook to reduce retiree health care benefits, or to require present retirees to contribute to their own health care plans, or to restructure the benefits system in any way other than to legislate state-imposed modifications of freely negotiated contracts." *Id.* at 615.

In holding that the statute was an unconstitutional infringement of the plaintiffs' substantive due process rights, this Court explained:

> Defendants argue that the compelled contributions are
> not arbitrary because they are assessed against public

school employees to support a fund that pays for retiree health care for public school employees. This, however, is an overly general characterization that gives the false impression that plaintiff employees are being required to contribute toward the funding of their own retirement benefits. The *mandatory contributions* imposed on current public school employees do not go to fund their own retirement benefits but, instead, to pay for retiree health care for already-retired public school employees.

While the present employees and the retired employees have in common their present or former employment by a public school employer, that does not mean that their interests as individuals (or even as groups of employees) are identical. Defendants have offered no legal basis for the conclusion that it comports with due process to require present school employees to transfer three percent of their incomes in order to fund the retirement benefits of others. Rather, it is a *mandatory, direct transfer* of funds from one discrete group, present school employees, for the benefit of another, retired school employees. The fact that these groups share employers does not render the scheme outside the constitutional protection of substantive due process. [*Id.* at 622-623 (emphasis added).]

Additionally, under *Studier*, there was no guarantee that current employees would enjoy retiree healthcare benefits because they were not "accrued financial benefits" and, therefore, were subject to revision and total revocation.

We cannot envision a court approving as constitutional a statute that requires certain individuals to turn a portion of their wages over to the government in return for a "promise" that the government will return the monies, with interest, in 20 years when the government retains the unilateral right to "cancel" the "promise" at any time and does not even agree that, if they do so, the monies taken will be returned. School employees cannot constitutionally be required to "loan" money to their employer school districts, with no enforceable right to receive anything in

exchange and without even a binding guarantee that the "loan" will be repaid. [*Id.* at 625.]

In contrast to the scheme established under 2010 PA 75, which was deemed unconstitutional in *AFT*, employee contributions under 2012 PA 300 are now voluntary. A member may now choose to either continue to participate in the retiree healthcare program and contribute 3% of his or her salary to do so, or the member may simply opt out of the program altogether. Members who opt in but fail to qualify for retiree healthcare benefits will be refunded their investment once they turn 60. At that time, they will receive an allowance over a 60-month period, using the same multiplier as for pension benefits. Thus, the constitutional infirmities found in *AFT* have now been cured. Although plaintiffs argue that this unreasonably affects members who have already vested, *Studier* clearly provides that retiree healthcare benefits are not accrued financial benefits implicated by Const 1963, art 9, § 24.

Accordingly, 2012 PA 300 does not violate Const 1963, art 9, § 24 as it relates to retiree healthcare benefits.

### E. SUBSTANTIVE DUE PROCESS

As an initial matter, although the state argues that plaintiffs cannot claim constitutional deprivations under both the Takings and Due Process Clauses of the state and federal Constitutions, this argument appears to have been specifically rejected in our Court's decision in *AFT*, in which this Court addressed the substantive arguments of both issues. In addition, although the state correctly argues that AFT has failed to preserve this issue for appellate review because it did not make such a broad argument in the Court of Claims, MEA has

consistently argued that 2012 PA 300 violates substantive due process. Therefore, a thorough examination of the issue is warranted.

US Const, Am XIV provides that no state shall "deprive any person of life, liberty, or property, without due process of law . . . ." Const 1963, art 1, § 17 provides that "[n]o person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law."

> [A]lthough the text of the Due Process Clauses provides only procedural protections, due process also has a substantive component that protects individual liberty and property interests from arbitrary government actions regardless of the fairness of any implementing procedures. The right to substantive due process is violated when legislation is unreasonable and clearly arbitrary, having no substantial relationship to the health, safety, morals, and general welfare of the public. In the context of government actions, a substantive due process violation is established only when the governmental conduct [is] so arbitrary and capricious as to shock the conscience. [*Bonner v City of Brighton*, 298 Mich App 693, 705-706; 828 NW2d 408 (2012) (citations and quotation marks omitted; alteration in original).]

Additionally,

> [t]he party challenging a legislative enactment subject to rational basis review must negative every conceivable basis which might support it. Under rational basis review, it is constitutionally irrelevant [what] reasoning in fact underlay the legislative decision. [W]e will be satisfied with the government's rational speculation linking the regulation to a legitimate purpose, even unsupported by evidence or empirical data. Thus, if a statute can be upheld under any plausible justification offered by the state, or even hypothesized by the court, it survives rational-basis scrutiny. [*Wells Fargo Bank*, 300 Mich App at 381 (citations and quotation marks omitted; second and third alterations in original).]

As previously stated, in striking down former MCL 38.1343e, as "unreasonable, arbitrary, and capricious and violat[ive of] the Due Process Clause," *AFT*, 297 Mich App at 627, this Court explained as follows:

> Defendants argue that the compelled contributions are not arbitrary because they are assessed against public school employees to support a fund that pays for retiree health care for public school employees. This, however, is an overly general characterization that gives the false impression that plaintiff employees are being required to contribute toward the funding of their own retirement benefits. The *mandatory contributions* imposed on current public school employees do not go to fund their own retirement benefits but, instead, to pay for retiree health care for already-retired public school employees.
>
> While the present employees and the retired employees have in common their present or former employment by a public school employer, that does not mean that their interests as individuals (or even as groups of employees) are identical. Defendants have offered no legal basis for the conclusion that it comports with due process to require present school employees to transfer three percent of their incomes in order to fund the retirement benefits of others. Rather, it is a *mandatory, direct transfer* of funds from one discrete group, present school employees, for the benefit of another, retired school employees. The fact that these groups share employers does not render the scheme outside the constitutional protection of substantive due process. [*Id.* at 622-623 (emphasis added).]

Additionally, this Court acknowledged that, under *Studier*, there was no guarantee that current employees would enjoy future retiree healthcare benefits because those benefits were not accrued financial benefits; accordingly, those benefits were subject to revision and total revocation.

> We cannot envision a court approving as constitutional a statute that *requires* certain individuals to turn a portion

of their wages over to the government in return for a "promise" that the government will return the monies, with interest, in 20 years when the government retains the unilateral right to "cancel" the "promise" at any time and does not even agree that, if they do so, the monies taken will be returned. School employees *cannot constitutionally be required* to "loan" money to their employer school districts, with no enforceable right to receive anything in exchange and without even a binding guarantee that the "loan" will be *repaid*. [*Id.* at 625 (emphasis added).]

The Court noted that former MCL 38.1343e provided "that the government confiscate the income of one discrete group in order to fund a specific governmental obligation to another discrete group." *Id.* at 627.

These constitutional infirmities have been cured by the voluntary nature of 2012 PA 300. Members may now opt in or opt out of the legislative scheme. Their voluntary contributions will be used to pre-fund their benefits. And, although plaintiffs complain that there is no guarantee of future healthcare benefits, under MCL 38.1391a(8), members' contributions are now protected with a refund mechanism. As the Court of Claims noted, it is clear that the Legislature carefully crafted 2012 PA 300 with the infirmities noted by *AFT* in mind.

The state, in enacting 2012 PA 300, has set forth a legitimate governmental purpose: to help fund retiree healthcare benefits while ensuring the continued financial stability of public schools. It is undisputed that in recent years public schools have been required to pay higher fees for the healthcare of retirees and their dependents. Healthcare costs are expected to continue to rise in the future. By seeking voluntary participation from members, the statute rationally relates to the legitimate governmental purpose of maintaining healthcare benefits for retirees while easing financial pressures on public schools.

That members have no assurance of receiving healthcare benefits upon retirement does not defeat the fact that 2012 PA 300 is reasonably related to a legitimate governmental purpose; instead, plaintiffs' arguments are focused primarily on whether the plan is ideal, which is not our inquiry. Plaintiffs have not negated the conclusion that the legislation reasonably relates to a legitimate governmental purpose.

Accordingly, we hold 2012 PA 300 does not violate members' substantive due process rights under the state or federal Constitutions.

### F. UNLAWFUL TAKING AND UNJUST ENRICHMENT

Finally, plaintiffs assert that the healthcare contributions set forth in 2012 PA 300 are an unlawful taking of their members' property and the state is unjustly enriched as a result. We disagree.

US Const, Am V provides, "[N]or shall private property be taken for public use, without just compensation." Similarly, Const 1963, art 10, § 2 states, "Private property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law."

Unjust enrichment is an equitable doctrine. *Morris Pumps*, 273 Mich App at 193. It is the equitable counterpart of a legal claim for breach of contract. See *Keywell & Rosenfeld v Bithell*, 254 Mich App 300, 328; 657 NW2d 759 (2002). "Unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another." *McCreary v Shields*, 333 Mich 290, 294; 52 NW2d 853 (1952) (citation and quotation marks omitted). "[I]n order to sustain a claim of . . . unjust enrichment, a plaintiff must establish (1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity

resulting to the plaintiff because of the retention of the benefit by the defendant." *Morris Pumps*, 273 Mich App at 195.

In *AFT*, this Court concluded that former MCL 38.1343e violated the Takings Clauses of the federal and state Constitutions, rejecting the defendants' assertion that the Takings Clauses were not implicated. The Court stated that "where the government does not merely impose an assessment or require payment of an amount of money without consideration, but instead asserts ownership of a specific and identifiable 'parcel' of money, it does implicate the Takings Clause. Indeed, the United States Supreme Court has termed such actions violations 'per se' of the Takings Clause." *AFT*, 297 Mich App at 618, quoting *Brown v Legal Foundation of Washington*, 538 US 216, 235; 123 S Ct 1406; 155 L Ed 2d 376 (2003). Therefore, because MCL 38.1343e took private property without providing any form of compensation, the trial court correctly ruled that the statute violated the Takings Clauses of the Fifth Amendment and Const 1963, art 10, § 2. *Id.* at 621.

However, there is no "taking" under 2012 PA 300 because participation in the retiree healthcare system is now voluntary. Unlike in *AFT*, in which the retiree healthcare contributions were mandatory and involuntary, members under the new legislation now have a choice. Thus, it cannot be argued that members' wages have been seized or confiscated, as was the case in *AFT*. In addition, MCL 38.1391a(8), as enacted by 2012 PA 300, provides for repayment of member contributions for those individuals who have elected into the retiree healthcare system, but fail to vest in the system. Members are provided a full refund increased by 1.5% multiplied by the total number of years of contributions. While plaintiffs argue that they are deprived of

the time-value of this money, that does not negate the fact that the process is entirely voluntary.

Accordingly, 2012 PA 300 neither unlawfully takes members' property nor does it amount to unjust enrichment.

Affirmed. No costs awarded to either party, a public question being involved. MCR 7.216(A)(7) and MCR 7.219(A).

SAAD, P.J., concurred with K. F. KELLY, J.

GLEICHER, J. (*concurring*). I concur with the result reached by the majority. I write separately to clarify my reasons for doing so.

In broad outline, plaintiffs have raised constitutional challenges to two portions of 2012 PA 300. The first involves pension benefits. Pursuant to the act, members of the Michigan Public School Employees' Retirement System (MPSERS) must increase their payroll deductions to maintain the 1.5% pension factor that formerly applied to all public school employee pensions. And under 2012 PA 300, MPSERS members must pay an increased healthcare premium equivalent to 3% of their compensation or instead elect to join a "Tier 2" defined contribution benefit plan.

I concur with the majority's resolution of plaintiffs' healthcare benefit claim. As the majority explains, the Supreme Court concluded in *Studier v Michigan Pub Sch Employees' Retirement Bd*, 472 Mich 642; 698 NW2d 350 (2005), that public school employees have no constitutional entitlement to healthcare benefits. The *Studier* Court held, "[T]he Legislature intended for payment of health care benefits by the MPSERS under MCL 38.1391(1) to simply be a 'fringe benefit' to which public school employees would never have a contractual

entitlement." *Id.* at 667-668. Healthcare benefits do not even qualify as "financial" benefits protected under Const 1963, art 9 § 24, the *Studier* Court further held, because they are not in the form of "monetary payments." *Id.* at 655. As Justice CAVANAGH articulated in dissent, the *Studier* majority found it constitutionally acceptable for our state to promise healthcare benefits to its teachers, and to break this promise at will. *Id.* at 679 (CAVANAGH, J., dissenting).

Nevertheless, in *AFT Mich v Michigan*, 297 Mich App 597, 604; 825 NW2d 595 (2012), this Court struck down on constitutional grounds a statutory modification of plaintiffs' healthcare benefit formula. The 2010 act at issue in *AFT* required "that public school districts . . . withhold three percent of each employee's wages and remit the amount to the MPSERS as 'employer contributions' to the trust that funds retiree health care benefits." *Id.* The *AFT* Court held that the law impaired contractual rights and allowed the government to take private property without compensation. *Id.*

The Legislature made virtually no change to the language struck down in *AFT*, but added a provision—MCL 38.1391a(5)—permitting members to avoid the 3% wage withholding by joining a "Tier 2" plan. The majority reasons that "the voluntary nature of 2012 PA 300" allowing public school employees to "opt in or opt out of the legislative scheme" cured the constitutional infirmities discerned by the *AFT* Court. Plaintiffs fail to persuasively counter this logic. Plaintiff Michigan Education Association (MEA) argues that the act "impose[s] a significant contribution requirement on all MPSERS members, including those who have been members of the retirement system for many years and whose rights to retiree health premium payments have vested." The MEA concedes, however, that *Studier* negates this argument.

On the other hand, I agree with plaintiffs that *pension* benefits are clothed with constitutional protection from impairment or diminishment. Const 1963, art 9, § 24 serves "to ensure that public pensions be treated as contractual obligations that, once earned, could not be diminished." *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich 295, 311; 806 NW2d 683 (2011). See also *Kosa v State Treasurer*, 408 Mich 356, 360; 292 NW2d 452 (1980) ("To gain protection of their pension rights, Michigan teachers effectively lobbied for a constitutional amendment granting contractual status to retirement benefits."). As the Supreme Court explained in *Advisory Opinion re Constitutionality of 1972 PA 258*, 389 Mich 659, 662-663; 209 NW2d 200 (1973), "it was the intention of the framers of the constitution" to make the accrued financial benefits of public pensions "contractual rights."

Plaintiffs contend that the enforceable contract includes the 1.5% multiplier formula in effect by statute since 1945. However, no evidence supports that 2012 PA 300 impairs or reduces the benefits earned pursuant to the 1.5% multiplier that accrued before 2012 PA 300 took effect. Further, in *Advisory Opinion re Constitutionality of 1972 PA 258*, 389 Mich at 663, the Supreme Court observed that under Const 1963, art 9, § 24, "the Legislature cannot diminish or impair accrued financial benefits, *but we think it may properly attach new conditions for earning financial benefits which have not yet accrued.*" (Emphasis added.) Plaintiffs have failed to distinguish this language from the case at bar. Although plaintiffs have pointed to caselaw from other jurisdictions that reached a result contrary to the majority opinion, in most of those cases the courts found that statutory language created binding contracts. To date, our Supreme Court has not found any binding contrac-

tual obligations residing within legislative enactments. To the contrary, in *Studier*, 472 Mich at 661, the Supreme Court emphasized "the strong presumption that statutes do not create contractual rights."

Finally, plaintiffs contend that 2012 PA 300 violates the second sentence of art 9, § 24, which states, "Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities." MEA's brief contends that the act "uses current service contributions levied against the members to finance the unfunded accrued liabilities of MPSERS, *i.e.*, $15.6 billion of the State's unfunded accrued liability that accrued to MPSERS members in the past."[1] According to plaintiffs, 2012 PA 300 "is an attempt to make the members of MPSERS pay for a large portion of the pension benefits which had already accrued to them prior to" the act's passage.

The record neither supports nor refutes that at the time 2012 PA 300 was enacted, the MPSERS balance sheet included "unfunded accrued liabilities" that will be paid through a mechanism created by the act. Nor does the record demonstrate whether the Legislature, or MPSERS, has applied current member contributions against unfunded accrued liabilities. If 2012 PA 300 has resulted in the collection of money used to meet pre-2012 unfunded accrued liabilities through a "borrowing scheme" similar to that condemned in *Kosa*, 408 Mich 356, I would agree that *as applied*, the act raises constitutional concerns. In my view, this issue should be

---

[1] Earlier in the same brief, the MEA proclaims: "There is no financial crisis regarding MPSERS. It is and has been paying for all pension benefits that come due. The Michigan Legislature has never declared that there was a financial crisis regarding MPSERS. MPSERS has sufficient money to meet its financial commitments to its retirees."

addressed with the benefit of a full evidentiary record in a different case. Because the evidence necessary to evaluate this issue is not before this Court, I concur with the majority that based on the challenges raised here, 2012 PA 300 passes constitutional muster.